1  ERIN E. SCHNEIDER (Cal. Bar No. 216114)
    schneidere@sec.gov
2  JEREMY E. PENDREY (Cal. Bar No. 187075)
    pendreyj@sec.gov
3  ANDREW J. HEFTY (Cal. Bar No. 220450)
    heftya@sec.gov
4  RUTH L. HAWLEY (Cal. Bar No. 253112)
    hawleyr@sec.gov
5

6

7

8                          UNITED STATES DISTRICT COURT
9                         NORTHERN DISTRICT OF CALIFORNIA
                                SAN JOSE DIVISION
10

11  SECURITIES AND EXCHANGE COMMISSION,        Case No.

12                   Plaintiff,
                                               **COMPLAINT**
13           vs.

14  DANIEL MATTES,

15                   Defendant.
16

17

18       Plaintiff Securities and Exchange Commission (the "Commission") alleges:

19                          **SUMMARY OF THE ACTION**

20       1.      From at least March 2014 through February 2015, Daniel Mattes, the founder and

21  former Chief Executive Officer of Jumio, Inc., a private Palo Alto, California based mobile

22  payments company, defrauded investors by providing them with materially misstated financial

23  statements that purported to show that Jumio had earned significantly more revenue and profits

24  that it actually did.

25       2.      In approximately April 2014, Mattes began selling a portion of his personal

26  Jumio shares to investors on the secondary market, so that he could monetize his stake in the

27  company. To facilitate these sales, Mattes provided investors with financial statements that,

28  among other things, overstated Jumio's revenue by more than ten times through inclusion of

revenue that Jumio did not earn as well as revenue from a round-trip transaction that had no economic substance.  He also falsely told at least one secondary market investor that he was not selling any of his own Jumio shares, because in his words, "there was lots of great stuff coming up" for Jumio and "he'd be stupid to sell at this point."   Mattes also engaged in efforts to hide his sales from Jumio's board of directors and made false statements to certain of Jumio's lawyers, who signed off on the sales.  Mattes profited by approximately $14 million  by selling his personal shares in Jumio to the secondary market investors.

3.       Jumio restated its financial statements in 2015.  In 2016, Jumio filed for bankruptcy and these investors lost their entire investment.

4.       The Commission seeks an order enjoining Mattes from future violations of the securities laws, requiring him to pay disgorgement and prejudgment interest, a civil monetary penalty, prohibiting him from acting as an officer or director of any publicly listed company, and providing other appropriate relief.

## JURISDICTION AND VENUE

5.       The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.       This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7.       Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

8.       Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts, transactions, practices, and courses of business that form the basis for the violations alleged in

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2800
SAN FRANCISCO, CA 94104 I (415) 705-2500

this complaint occurred in this District.  Defendant met with and solicited prospective investors in this District, and the relevant offers or sales of securities took place in this District.

9.     Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Jose Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Santa Clara County.

## DEFENDANT

10.     Daniel Mattes, age 46, of Wels, Austria, is the founder and former CEO of Jumio, Inc.  From 2010 to 2015, he lived part-time in Silicon Valley.  Previously, in 2005, Mattes founded Jajah, a Mountain View-based technology company that he sold for hundreds of millions of dollars in 2009.  After leaving Jumio in 2015, Mattes founded 42.cx, an artificial intelligence startup in Austria; he currently is the CEO of that company.

## FACTUAL ALLEGATIONS

11.     Daniel Mattes founded Jumio, a private mobile payments company, in Palo Alto in 2010.  Jumio sought to make purchases on mobile phones easier and more secure by using its technology to verify customers' IDs and credit cards, thereby increasing the completion rate of mobile transactions and decreasing fraud.  From 2011 to 2013, the company received several rounds of private funding.

**A.     Mattes Overstated Jumio's Financial Statements**

12.     Jumio had two sources of revenue: a business connected to the payment processing industry that Mattes ran out of Austria ("Processing Business"), and a business based on licensing Jumio's ID and credit card verification technology, that was run out of Palo Alto ("Product Business").  Jumio's Processing Business made money by introducing third-party merchants to a payment processor ("Payment Processor"), and getting a commission for doing so.  The Payment Processor would collect payment processing fees directly from the merchant, and would then pay Jumio an approximately 10% referral commission.  Jumio's Product Business made money by licensing its products (ID and credit card verification for purchases made on mobile phones) to merchants.

13.     Mattes personally prepared Jumio's consolidated financial statements for 2013 and 2014, which included the financial results for both Jumio's Processing Business and its Product Business.

14.     Mattes overstated Jumio's Processing Business revenue and profitability on the financial statements by recording revenue that Jumio did not earn and by failing to include certain expenses. In 2013 and 2014, Mattes caused Jumio to record the total amount of processing fees collected by the Payment Processor—instead of the 10% Jumio earned—as Jumio's revenue. Mattes also omitted certain expenses associated with Jumio's commissions from the financial statements, thus overstating Jumio's profitability.

15.     Mattes overstated Jumio's Product Business revenue in two ways. First, he directed that the company recognize revenue for a large deal that had no economic substance. Second, he directed that Jumio immediately recognize the entire amount of money due under some of its contracts, even though it had not yet earned that money, and in some cases, even when it was clear that it was unlikely that the money would ever be paid.

16.     Almost half of the Product Business revenue Mattes directed to be recorded on Jumio's 2013 and 2014 financial statements was due to a round-trip revenue deal ("Round-Trip Transaction") that Mattes made with a third party software development company. Beginning in the first quarter of 2013, Mattes caused Jumio to recognize revenue from a contract with the software developer under which the software developer would ostensibly pay Jumio $710,000 a quarter for credit card verification scans that the developer could resell to third parties, and Jumio would ostensibly pay the developer $800,000 each quarter for software development services. At the time he made the deal, Mattes wrote to another Jumio employee that he should not get excited about the deal because, "it's more a deal to get our numbers straight for the upcoming round" of investor financing. After the first quarter of 2013, when Jumio paid the software developer the difference between the two amounts, the software developer stopped performing work for Jumio. Thereafter, no money was paid by either party. But Mattes continued to include

the revenue associated with the Round-Trip Transaction in Jumio's financial statements throughout 2013 and 2014.

17.     Mattes also overstated Jumio's Product Business revenue by causing the company to immediately recognize as revenue the entire amount of money due under some of its contracts, which were subscriptions with customers for a period of time, even if Jumio had not yet provided its services to the customer, or at times even after it was clear that the customer would not pay its bill.  Under Generally Accepted Accounting Principles, Jumio should have recognized the revenue over the period of the subscription as the revenue was earned, and should not have recognized revenue from deals where collectability was not reasonably assured.

18.     The misstatements Mattes made in Jumio's financial statements were material. Jumio's 2013 financial statements represented: that Jumio's gross revenue was $101 million, when in fact it was $9.5 million;  that its gross margin was $23 million,  when in fact it was $9.2 million;  and that it had a net profit of $1.3 million,  when in fact it had a net loss of $10 million. Jumio's 2014 financial statements represented:  that Jumio's gross revenue would be $150 million,  when in fact it was $7.7 million;  that gross margin would be $26 million,  when in fact it was $3 million;  and that the company would have a net loss of $11 million,  when in fact it had a net loss of $26 million.

19.     Mattes knew, or was reckless in not knowing,  that Jumio's 2013 and 2014 financial statements were misstated.  Because Mattes personally negotiated and signed Jumio's contract with the Payment Processor, he knew that Jumio had only earned about 10% of the revenue that he caused to be recorded on its financials.  He also knew that he had omitted the Processing Business expenses from external versions of the financial statements that he provided to investors, even though he included the expenses on certain internal versions of the financials. He also knew, or was reckless in not knowing, that the Round-Trip Transaction lacked economic substance and that he was he was recording Jumio's subscription revenue in advance of when that revenue actually was earned, and in some cases, when it would likely not be paid at all.

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2800
SAN FRANCISCO, CA 94104 I (415) 705-2500

**B. Mattes Deceived Jumio's Board of Directors in Order to Sell His Stock**

20.     In early 2014, Mattes set up a stock sale program for Jumio employees to enable them to sell some of their equity in the company. Because Jumio was a private company, its shares were not traded on an exchange. Accordingly, Mattes made arrangements for the employees to sell their Jumio shares through a broker that specialized in private, secondary market transactions (that is, sales of shares from one investor to another, rather than from an issuer to an investor). The Jumio employees sold their shares through the stock sale program in March and April of 2014.

21.     Mattes was contractually obligated to give the board members prior written notice before selling his shares in Jumio. At the time of the employee stock sale, Mattes had already sold large blocks of shares to two institutional investors, with Jumio's board's approval. One of the board members had told Mattes that the board would not approve any more sales. This was because the board wanted Mattes to be strongly incentivized to maximize the company's value.

22.     When Mattes obtained approval from Jumio's board of directors for the employee stock sale program, he represented to the board in writing that he and other senior executives would be excluded from the program. Although Mattes later gave a presentation to the board stating that "executives" were considering selling their shares, he told the board that "executives" referred to Jumio's VPs, not himself. Nonetheless, Mattes sold his own shares through the employee stock sale program, without telling Jumio's board of directors.

23.     Jumio's general counsel and outside counsel told Mattes multiple times, both orally and in writing, that he needed board consent for the sales. Mattes falsely told both of the lawyers, however, that the members of the board had informally approved the sales and would ratify them in writing later.

**C. Mattes Used Jumio's Misstated Financial Statements to Sell His Stock to Secondary Market Investors**

24.     From April 2014 through February 2015, Mattes used the stock sale program to

sell millions of his own Jumio shares to secondary market investors, including a number of individuals and funds. Mattes made a profit of $14,617,922 from these sales.

25.     All of these sales were based on Jumio's overstated financial statements. In March 2014, Mattes personally directed that the 2013 financial statements be placed in a data room for investors to view in deciding whether to buy Jumio shares. By May 2014, he caused the 2014 financial statements (which ostensibly contained a mix of actual results for 2014 and forecasts for the remainder of the year) to be provided to the broker who was arranging the sales. The broker, with Mattes' knowledge, orally discussed the 2014 financial statements with investors. Mattes also personally discussed Jumio's financial results with several of the investors, in person and in phone calls. Many of the secondary market investors would not have bought the shares if they had known that Jumio's revenue was less than 10% of what they had been told, and that the company did not have a net profit.

26.     Mattes also misrepresented to at least one investor that he was not selling any of his own shares. The investor asked in an email: "Are any of the sellers…current or former employees of Jumio?" The broker who was selling the shares responded, "I have not sold a single share nor has Daniel [Mattes]." The broker then forwarded the investor's questions and his response to Mattes, who edited the email to add additional information for the investor on other topics, but did not correct the false statement that he had not sold a single share.

27.     After the transaction closed and the investor saw that his money was to be wired to Mattes' company in Austria, he called Mattes for an explanation. Mattes falsely assured him that he himself was not selling shares, but was merely using his company as a vehicle to buy the shares of early investors and then resell those shares to third parties, for legal reasons that Jumio's lawyer had insisted on. Mattes told the investor that he did not want to sell a single share, because there was "lots of great stuff coming up" and that "he'd be stupid to sell at this point."

28.     Mattes' representation that he was not selling his shares was important to the investor because he believed Mattes would not sell his own shares if Jumio was a good investment.

**D.  Jumio Restated its Financial Statements and Declared Bankruptcy**

29.     In late 2014, Jumio hired a CFO, who quit after just a few days on the job.  He told Jumio's board that Jumio's revenue numbers were inaccurate, pointing out the Round-Trip Transaction in particular.  Jumio's board then hired external accountants to assess Jumio's books, leading to a restatement of Jumio's 2013 and 2014 financial statements.  Even after Mattes knew that the financial statements would need to be restated, he continued selling his stock on the secondary market.

30.     In mid-2015, after an internal investigation, Mattes resigned.  Jumio filed for Chapter 11 bankruptcy in 2016, and the shares that Mattes had sold to the secondary market purchasers became worthless.

## FIRST CLAIM FOR RELIEF

### *Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

31.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 30.

32.     By engaging in the conduct described above, Defendant Mattes, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a)     Employed devices, schemes, or artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;  and

(c)     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

33. By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF

### *Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

34. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 33.

35. By engaging in the conduct described above, Defendant Mattes, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

(1) with scienter, employed devices, schemes, or artifices to defraud;

(2) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

36. By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently enjoin Defendant Mattes from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### II.

Issue an order requiring Defendant Mattes to disgorge the ill-gotten gains received as a result of the violations alleged herein, plus prejudgment interest thereon.

### III.

Issue an order requiring Defendant Mattes to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Prohibit Defendant Mattes from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated: April 2, 2019          Respectfully submitted,


 */s/ Ruth L. Hawley*
RUTH L. HAWLEY
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION